McGUIRE, Respondent, v. QUINCY, OMAHA & KANSAS CITY RAILROAD COMPANY, Appellant.

St. Louis Court of Appeals, January 21, 1908.

1. MASTER AND SERVANT: Contributory Negligence. A brakeman was ordered by his foreman to go between two cars for the purpose of coupling them, and while attempting to do so other cars were allowed to drift against one of them, whereby he was injured. He was not guilty of contributory negligence on the ground that he did not instantly perceive the coupler he was trying to set was out of order and that the opposite one could have been adjusted with safety; he was not guilty of contributory negligence in such case unless in common prudence he would have realized that to continue as long as he did in his attempt to set the defective coupling was dangerous.

2. ———: Fellow-Servant: Vice-Principal. The master cannot escape liability for injury to his servant on the ground that the injury was done by the negligence of fellow-servants, where such fellow servants were acting under the direction of a vice-principal.

3. ———: Negligence: Contributory Negligence. In an action by a brakeman against his employer, a railroad company, for injuries received while attempting to couple two cars, caused by the negligent running of other cars against those he was attempting to couple, the evidence is examined and *held*: the question whether the plaintiff was guilty of contributory negligence was properly submitted to the jury.

4. ———: ———: Assumption of Risk. Where a brakeman in attempting to couple two cars for his employer, a railroad com-

pany, was injured by the drifting of other cars against one of such cars, and where in an action for such injuries it was shown that it was the custom at that place to permit cars to drift in that manner, the plaintiff did not assume the risk by attempting the coupling, knowing such custom, where it was not shown that that method of switching cars was customary on other railroads or that railroad except at that particular place, because proof of the custom at that place did not show the method to be a proper one.

5. ———: ———: ———: ———. In such case the plaintiff did not assume the risk of injury from such method of handling the cars, although he was familiar with it, if such method was a negligent one, since he did not assume the risk of injury incident to the master's negligence.

6. ———: Negligence: Fellow-Servant and Vice-Principal. Under sections 2874 and 2875, Revised Statutes 1899, a foreman of a train crew is not the fellow servant of a brakeman upon the same train, but a vice-principal, so that the railroad company is liable to the brakeman for injuries caused by other members of the crew acting under the negligent direction of such foreman.

Appeal from Clark Circuit Court.—*Hon. Chas. D. Stewart*, Judge.

AFFIRMED.

*Campbell & Ellison, Jas. G. Trimble* and *Willard P. Hall* for appellant.

(1)     The court should have instructed the jury to find a verdict in favor of defendant, because the evidence showed that there was a safe way for plaintiff to perform the duty in which he was engaged and he voluntarily chose a hazardous way in which to perform it.     .Morris v. Railroad, 108 Fed. (C. C. A.), 747; Suttle v. Railroad, 144 Fed. (C. C. A.), 668.     (2) The trial court erred in holding that plaintiff did not assume the risk incident to switching done in the usual and customary manner by the crew of which he was a member, and in holding that if said manner was careless defendant was liable.     2 Labatt on Master and Servant, secs. 649, 650.     And the doctrine there an-

nounced finds support in a great many adjudicated cases. Nottage v. Sawmill Phoenix (C. C.), 133 Fed. 979; St. Louis, etc., Co. v. Miller, 126 Fed. 495, 61 C. C. A. 477, 63 L. R. A. 551; Railroad v. Baker, 91 Fed. 224, 33 C. C. A. 468; Martin v. Railroad, 118 Iowa 148, 91 N. W. 1034, 59 L. R. A. 698, 96 Am. St. 371; Kinsley v. Pratt, 148 N. Y. 372, 42 N. E. 986, 32 L. R. A. 367; O'Maley v. Gaslight Co., 158 Mass. 135, 32 N. E. 1119, 47 L. R. A. 161; Birmingham Elec. Co. v. Allen, 99 Ala. 359, 13 South. 8, 20 L. R. A. 457; Browne v. Siegel, 191 Ill. 226, 60 N. E. 815; Mulhern v. Lehigh Co., 161 Pa. 270, 28 Atl. 1087; Swenson v. Osgood Mfg. Co., 91 Minn. 509, 98 N. W. 645; Williams v. Wagner Co., 110 Wis. 456, 86 N. W. —; Helmhe v. Thilmany, 107 Wis. 216, 83 N. W. 360; Langlois v. Dunn (R. I.), 57 Atl. 910; Coal Co. v. Muir, 20 Colo. 320, 38 Pac. 378, 26 L. R. A. 435, 48 Am. St. Rep. 299; Grand v. Railroad, 83 Mich. 564, 47 N. W. 837, 11 L. R. A. 402; McGinty v. Waterman (Minn.), 101 N. W. 300; McRickard v. Flint, 114 N. Y. 222, 21 N. E. 153; White v. Wittemann L. Co., 131 N. Y. 631; 30 N. E. 236; Honor v. Albrighton, 93 Pa. 475; Anderson v. Lumber Co., 67 Minn. 79, 69 N. W. 630; Fleming v. Railroad, 27 Minn. 111, 6 N. W. 448; Chicago Pack. Co. v. Rohan, 47 Ill. App. 654; Munn v. Wolff, 94 Ill. App. 122; Keenan v. Edison Illum. Co., 159 Mass. 379.

*Higbee & Mills* for respondent.

(1) It is one of the duties of an employer to exercise reasonable care that the place in which he sets his servant to work, and the system or method adopted by the employer for the doing of the work shall be reasonably safe for the servant and free from latent dangers known to the master or discernible by an ordinarily prudent master in the circumstances. The duty extends to the system or method of arranging the work. Burns v. Tel. Co., 70 N. J. L. 745, 67 L. R. A. 956, 957;

Francis v. Railroad, 127 Mo. 658, 673, instruction 11.
Whether plaintiff in attempting to open the knuckle,
contributed to his injury in going between the cars and
attempting to draw the pin and open the coupler with
both hands was a question solely for the jury.    Shunt-
ing the cars without notice was negligence.    Black v.
Railroad, 172 Mo. 187.    It is only in a case in which
reasonable men cannot fairly differ that a court may
declare a plaintiff guilty of contributory negligence.
It was Clark's duty to have notified plaintiff of his dan-
ger.    Kennedy v. Railroad, 190 Mo. 424; Allen v. Tran-
sit Co., 183 Mo. 426; Young v. Waters-Pierce Co., 185
Mo. 666; Thorpe v. Railroad, 89 Mo. 650; Francis v.
Railroad, 127 Mo. 658.    (2) It is claimed plaintiff
knowingly chose a dangerous way when there was a safe
way known to him to do his work.    This question was
submitted to the jury by defendant's fifth instruction.
The verdict is conclusive that there was evidence tend-
ing to show that the course pursued by plaintiff was not
more dangerous than the other, and this court will not
consider whether he chose the safe or dangerous course.
Black v. Railroad, 172 Mo. 187; Brady v. Railroad,
102 S. W. 984.

GOODE, J.—Plaintiff, who was a brakeman in the
employ of the defendant company, had his right hand
mutilated while coupling cars.    At the station of Dan-
forth, where the accident happened, several sidetracks
and a "Y" were connected with the main line, the left
or west leg of the Y running northwardly from the
main line, which ran east and west.    Plaintiff was one
of a crew on a freight train, the remainder of the crew
consisting of another brakeman and foreman, an engi-
neer and a fireman.    It was known as a switching
crew and worked about Novinger, a station on defend-
ant's line.    The particular train plaintiff was on the
day of the accident had run to Danforth, one mile west

of Novinger, with four cars of coal, two in front and two behind the engine.   Seven or eight cars loaded with coal were standing on the Y and the intention was to collect those cars and reform the train at Danforth. In doing this plaintiff, by order of the foreman, rode two of the cars of the train down the Y after they were detached from the engine.   He was on his way back to the train and walking along by the side of the cars which stood on the Y, when the foreman ordered him to arrange those standing cars for coupling; at the same time telling him he (the foreman) intended to "pull track No. 1 and then shove the Y."   By the expression "pull track No. 1" he meant the loaded cars on that track would be hauled to the west of the intersection with the Y in arranging the train, and we understand "shoving the Y" meant the engine would be attached to the cars standing on the Y to move and connect them with the train.   Plaintiff stepped between two of the standing cars to adjust one of them for a coupling, and at nearly the same instant the foreman threw the switch of the Y so the engine would run along the main track detached from the other two cars of the train, after having imparted sufficient momentum to said two cars to carry them (or for them to "drift," as the witnesses said) on and along the Y without further propulsion.   They drifted far enough to collide with the cars on the Y, shoved these together and crushed plaintiff's hand, while he was setting the coupler.   The foreman's version of the facts agreed with plaintiff's in the main.   The foreman admitted telling plaintiff to go between two of the cars on the Y and prepare them to couple, but denied telling him the Y would be shoved.   This circumstance is material only because it tended to assure plaintiff there was no danger the cars which he was to work between, would be knocked together while he was between them.   That is, it might have left the impression on his mind that instead

of being turned loose to drift down the Y while he was arranging for a coupling, no cars would be thrown on the Y except by the engine shoving them; and as the engine had passed along the main track just before plaintiff went between the cars, and he had been told it would pull the loaded cars thereon to the west of the intersection of the Y, he had no reason to be on the watch for drifting cars.    Plaintiff testified that when a brakeman was to couple or uncouple cars, the custom was not to move other cars toward those he had gone between, until he was seen to be clear and where the other cars would not hit him.    He said if there had been a man standing to signal the engineer and watch for plaintiff's signal, no accident would have happened.    The casualty occurred in this way, according to plaintiff's testimony.    The hour was after dusk and plaintiff carried a lantern in his left hand.    The cars were equipped with automatic couplers operated by levers.    The coupling appliances were called "knuckles" and resembled two human hands or fists with the fingers clasped into each other.    A pin was connected with the couplers in some manner, which had to be pulled out before the couplers would lock.    Plaintiff pulled a lever bound by a chain to one of the couplers and designed to open it, but the lever failed to work.    He then took hold of the pin and chain with his left hand and tried to adjust them in that way.    His right hand was on a "knuckle," and while pulling on the chain he instinctively threw out his lantern as a warning. Just then the cars were forced together by the impact of the drifting cars and his hand was caught and mangled so badly three fingers had to be amputated.    The only discrepancy in the versions of the foreman and the plaintiff, except as to the statement that the foreman intended to shove the Y, related to the custom of moving cars while a brakeman was making a coupling The foreman said they (the train crews) knew no rules;

but a man had to act on his own judgment; and the general effect of his testimony is that it was incumbent on a brakeman, while coupling cars, to look out for his own safety. Verdict and judgment for $3,000 were given against defendant.

The point is made that plaintiff chose a dangerous instead of a comparatively safe way to arrange for the coupling; that he worked on the south side of the standing cars, which, looking toward the engine, would be the left side, when he might have worked on the north side where he would have been visible to and could have signalled the engineer, who sat on the right (north) side of the engine cab. Considerable stress is laid on this circumstance, but we do not discern its importance, inasmuch as the injury was not caused by the engine entering the Y and backing cars against the ones plaintiff was between, but by two drifting cars. That plaintiff failed to keep himself within the engineer's view was not conclusively established, and if it had been, it would have been insufficient ground for a ruling by the court that plaintiff was guilty of negligence contributing to the accident.

Contributory negligence is asserted also, on the assumption there was a safer method of preparing the cars to couple than the one plaintiff used, because, when he found the coupler on one of the two cars was out of order and would not work readily, he should have set the opposite coupler, instead of remaining between the cars and endeavoring to set the defective one. The defect of the coupler plaintiff tried to set was that the lever had become separated from the chain connecting it with the pin in the knuckle, to enable the pin to be pulled by applying power to the lever. It is insisted that as soon as the difficulty of removing the pin was known, plaintiff ought to have turned his attention to the opposite knuckle. Plaintiff's efforts had continued but a moment before the collision occurred, and

surely he ought not to be refused redress by a ruling of the court that he was guilty of contributory negligence merely because he did not instantly realize he could not adjust the defective coupler without remaining between the cars longer than was prudent. At this point the present case, under the view most favorable to defendant, resembles Black v. Railroad, 17 Mo. 177 and Edington v. Railroad, 204 Mo. 61, 102 S. W. 491, wherein a similar issue was held to be for the jury. The court below left the question to the jury in an instruction which was, we think, unjust to plaintiff; for it made him guilty of contributory negligence, if, while at work between the cars, he discovered the coupling he was trying to set was out of order, and that the opposite one could be adjusted with safety. The instruction omitted to require, as an element of such negligence, a finding that plaintiff should, in common prudence, have realized it was dangerous to continue the attempt to set the defective coupling as long as he did.

Complaint is made of an instruction given for plaintiff, which, in substance, advised the jury that if the foreman of the crew ordered plaintiff to open a coupler of one of the cars on the Y, and while plaintiff was doing this, another member of the crew negligently sent one of the cars down the Y and against one of the two cars plaintiff was between, without warning him, he should have a verdict, if he was exercising reasonable care and caution on his part to avoid injury. If the evidence did not show conclusively that Clark himself was responsible for the drifting of the cars against those plaintiff was at work between, we would have to inquire whether this instruction was erroneous in stating that if any member of the crew, other than plaintiff, sent the cars down the Y, etc., plaintiff was entitled to a verdict. Had the two been set adrift by some other member of the crew than the foreman, the soundness of the

instruction would depend on the effect of our fellow-servant statute on the common law doctrine of assumed risk.　　But as Clark was a vice-principal, which will be shown *infra,* and as his own testimony proves he was directing in person the movements of the cars, the words "any other member of the crew" were superfluous in the instruction, and do not require us to ascertain the force of the statute in that regard.

The instruction is criticised further　because　it takes for granted that sending the drifting cars against the ones plaintiff was at work between, without warning him of their approach, was a negligent act, although there was testimony for defendant that such was the practice at Danforth and plaintiff was expected to guard against injury from it.　　As we understand this argument, it concedes this was a careless mode of handling cars; and if this is so, defendant is responsible unless it is excused either because plaintiff had assumed the risk, a defense untenable under the current decisions of the Supreme Court and already disposed of, or because he was guilty of negligence contributing to his injury in not detecting the approach of the cars.　　It is certain that contributory negligence in this matter was not conclusively established.　　At most it was a question for the jury and was submitted in the instruction criticised and in others given for the defendant. We may say, too, that the facts exclude the belief that any negligence of plaintiff contributed to the accident. In obedience to the foreman's order he had gone between the cars, and while there and out of sight of the cars standing on the main line, the latter were thrown against those he was working between.

The assignment of error most urged is an instruction given by the court that plaintiff assumed the ordinary risk of his employment, but not risks resulting from negligence of the foreman or other members of the crew, and the refusal to grant an instruction asked by de-

fendant, which declared that if the switching at the time and place in question, was performed in the usual and customary manner of doing such work, plaintiff could not recover.    In presenting this point, counsel for defendant say the only real issue of fact in the case was whether the method of switching practiced by the crew was stated truly by Clark, the foreman, or by plaintiff himself.    We quote from defendant's brief:

"Clark testified that it was the constant practice of the crew in making up trains at Danforth and elsewhere, to let cars drift down while the brakeman was engaged in opening the knuckles; that no signal was given to the brakeman, and that it was his duty to look out for himself; while plaintiff testified that his 'understanding' was the cars were not to be moved until it was seen the brakeman was in the clear and the cars would not hit him, and that some one would give the brakeman warning."

In their argument counsel for defendant say if Clark's testimony is true, plaintiff, and the other members of the crew, had been switching cars in the same manner followed on the occasion of the accident, for a year, and "however careless and reckless that practice may have been, plaintiff knew of it fully and by continuing in the employment of defendant, he assumed all risks incident to it."    It is insisted further that the Missouri statute modifying the common law liability of railroad companies for an injury, does not impair the common law rule that a railroad employee assumes the risk of injury from an improper and hazardous method of performing certain work if he was aware of the method when he accepted service, or afterward learned of it and continued in the service.    The refused instruction declared plaintiff could not recover "if the business of switching, at the time and place in question, was done in the usual and customary manner of doing such work."    Under some decisions of our Supreme

Court, the defendant would not be liable on the ground that its method of handling trains showed a want of ordinary care, if the method was according to the general usage of railroad companies. [Minnier v. Railroad, 167 Mo. 99, 66 S. W. 1072; Chrismer v. Railroad, 194 Mo. 208, 92 S. W. 378, 196 Mo. 189, 208.] But the instruction required no finding that the cars were switched at the time of the accident according to the usual method of railway companies, but only that they were switched in the "usual and customary manner of doing such work." The foreman's testimony was the basis of the instruction, and he did not say the cars were switched either according to the method in general use on the defendant's road, or on other railroads; but merely that they were switched in the manner ordinarily used at Danforth. Surely the company's mode of switching cars at one station would not necessarily stamp the mode as proper; and hence the principle of the cases above cited does not apply and the instruction receives no warrant from them. If it should have been given, it is because plaintiff was familiar with the mode of handling cars at Danforth station, and by continuing in the service assumed any risk of injury entailed by their handling. In answer to this proposition it may be said that if the company knew its cars were constantly switched in a negligent and dangerous manner at said station and by a certain crew, defendant was guilty of negligence; and under the later decisions in this jurisdiction, the doctrine of assumption of risk would be no defense, even though plaintiff continued in the service with knowledge of the practice. [Blundel v. Elevator Co., 189 Mo. 552, 88 S. W. 103; Charlton v. Railroad, 200 Mo. 413, 434, 98 S. W. 529; Phippin v. Railroad, 196 Mo. 321, 346, 93 S. W. 410.] But the argument of defendant's counsel takes for granted that whatever negligence there may have been, in throwing on a brakeman while coupling cars the entire duty of

avoiding injury from the shoving or drifting of other cars, it was the negligence of the crew, who were fellow-servants of the brakeman, and therefore the company was not responsible. Putting aside other difficulties incident to this theory, it is apparent that to maintain it we must hold the statute declaring every railroad corporation owning and operating a railroad in this State, shall be liable for all damages sustained by any agent or servant while engaged in the operation of the railroad, by reason of the negligence of any other agent or servant, does not abrogate the common law rule that an employee assumes the risk of injury from the negligence of a co-employee. [R. S. 1899, sec. 2873.] Decisions by eminent courts lend support to this proposition, but in the writer's opinion it would defeat largely the main purpose of the statute, which is to get rid, in cases like this, of defenses based on the supposed assumption by railroad employees, of the risk of injury from the negligence of fellow-servants. But the facts before us do not call imperatively for a ruling as to the effect of the statute on that defense, and we will pass the question, to be determined, perchance, by our Supreme Court before it is presented to us for decision. According to another section of the statutes, plaintiff was not injured by the negligence of a fellow-servant, but by that of a vice-principal. Sections 2874 and 2875 of the statutes define vice-principals and fellow-servants in railroad work. The first section says all those persons engaged in the service of a railroad corporation who are entrusted with the authority, superintendence and control of other persons in the employ of the corporation, or with authority to direct any servants in the employ of such corporations, etc., are not fellow-servants with such employees. The second section says all persons engaged in the common service of a railroad company, who, while so engaged or working together at the same time and place, neither of said per-

sons being entrusted by the corporation with the superintendence of any other employee, are fellow-servants with each other. According to those statutory definitions, Clark, the foreman of the train crew, was not a fellow-servant of plaintiff, in giving the commands which led to the accident; and whatever may be said regarding the effect of the statute on the doctrine of assumption of risk, its classification of vice-principals and fellow-servants must be accepted as the test by which to determine the status of an employee. Clark's testimony proves that if any member of the train crew other than plaintiff, carelessly caused the accident, it was Clark himself. He ordered plaintiff to go between the cars and set the coupler, and he, too, was responsible for the other cars drifting on the Y and striking those plaintiff was between. When plaintiff stepped between the cars, Clark caused the two cars which were still hitched to the engine, to be detached and sent down the Y and then threw the switch for the engine to pass on Track No. 1. Hence the use of the words "other members of the crew," in the instruction given for plaintiff, declaring that though he assumed the ordinary risks of his employment, he did not assume risks resulting from the negligence of the foreman or other members of the crew, was, as in the instructions previously considered, harmless, even if erroneous; which we are far from conceding. It follows that the theory that plaintiff by continuing to work with the crew at Danforth after he knew its method of coupling cars, agreed to assume the chance of injury there from the negligence of his coservants, has no place in the case.

Other points are raised against the judgment, but they appear to us to be without merit and not of sufficient importance to require discussion.

The judgment is affirmed. All concur.